| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-2(c)**<br><br>**NORRIS, McLAUGHLIN & MARCUS, PA**<br>721 Route 202-206<br>P.O. Box 5933<br>Bridgewater, New Jersey 08807<br>(908) 722-0700 (Tel)<br>(908) 722-0755 (Fax)<br>Morris S. Bauer, Esq.<br>*Proposed Attorneys for the*<br>*Debtors/Debtors-In-Possession* | |
| In Re:<br><br>VISUAL MANAGEMENT SYSTEMS, INC.,<br>VISUAL MANAGEMENT SYSTEMS HOLDING, INC.,<br>VISUAL MANAGEMENT SYSTEMS, LLC,<br>AND INTELLIGENT PRODUCT DEVELOPMENT<br>GROUP, LLC<br><br>Debtors. | Chapter 11<br><br>Case Nos.    10-44748<br>10-44749<br>10-44750<br>10-44751<br><br>Judge: |

STATE OF NEW JERSEY    )
                       ) ss.:
COUNTY OF OCEAN        )

JASON GONZALEZ, of full age, being duly sworn according to law, upon his oath, deposes and states:

1. I am the President of Visual Management Systems, Inc. ("VMS, Inc."), Visual Management Systems Holding, Inc. ("VMSH, Inc."), Visual Management Systems, LLC ("VMS, LLC"), and Intelligent Product Development Group, LLC, ("IPDG", and together with VMS, Inc. and VMS, LLC, the "Debtors").

2. I am fully familiar with VMS, Inc., VMSH, Inc., VMS, LLC and IPDG's operations and business affairs, and duly authorized to make this Affidavit on behalf of all of the

Debtors. This Affidavit is intended to assist the Court and other parties-in-interest in understanding the circumstances that compelled the Debtors' Chapter 11 filings and to provide general information about the Debtors and their business operations that are germane to the First Day Motions (as defined below).

3. If called upon to testify, I could and would testify competently to the facts set forth herein, unless otherwise noted. I am authorized to submit this Affidavit.

4. On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief pursuant to Title, 11, Chapter 11 of the United States Code (the "Bankruptcy Code").

5. Since the Petition Date, the Debtors have remained in possession of their assets and continued management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. To minimize the potential disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' ability to conduct their business and formulate a plan of reorganization, the Debtors have requested the Court to consider, on an expedited basis, the following four (4) "first day" motions (the "First Day Motions"): (i) Motion for an Order Authorizing the Debtors' Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363 and 364 and Federal Rule of Bankruptcy Procedure 4001 (the "Cash Collateral Motion"); (ii) Motion Seeking Joint Administration of the Debtors' Chapter 11 Cases (the "Motion for Joint Administration"); (iii) Motion for an Order Authorizing the Debtors an Extension of Time Within Which to File Their Schedules of Assets and Liabilities and Their Statements of Financial Affairs (the "Motion to Extend Time to File Statements and Schedules"); (iv) Motion for an Order Authorizing, But Not Directing, the Debtors to Pay Pre-Petition Wages, Salaries, Taxes and Other Compensation (the "Wage Motion").

6. The purposes of the First Day Motions include, among other things to: (a) assist the Debtors in continuing to operate in the ordinary course of business; (b) ease the Debtors' transition into Chapter 11; (c) allow for the efficient and orderly administration of these cases; and (d) provide the Debtors with a "breathing spell" from aggressive creditor action while the Debtors formulate and propose a plan of reorganization designed to maximize recoveries for their estates, their creditors and their other stakeholders.

## Background

7. VMS, Inc. was incorporated in the State of Nevada in March 2004. VMS, Inc. was originally named Wildon Productions, Inc. ("Wildon") On July 17, 2007, VMS, Inc. acquired all of the outstanding capital stock of VMSH, Inc., a New Jersey corporation, in connection with the merger of its wholly owned subsidiary with and into VMSH, Inc. In connection with the merger, Wildon changed its name to VMS, Inc. Upon the completion of the acquisition, VMS, Inc. succeeded to the business of VMSH, Inc., that of a security integrator focusing primarily on video products.

8. VMS, Inc. is the sole owner of shares of VMSH, Inc.

9. VMSH, Inc. is the sole member of VMS, LLC and IPDG.[1] The Debtors conduct their operations through VMS, LLC, which provides protective technology solutions and remote management surveillance systems, and IPDG, which designs, manufactures and sells DVR's and NVR's.

10. VMS, Inc. is a publicly traded company. Its common stock may be considered a "penny stock". It was formerly quoted on the OTC Bulletin Board, but due to financial constraints relevant to its current petition, it has been unable to timely file its reports with the

---

[1] A third non-debtor wholly owned subsidiary of VMSH, Inc. is VMS Financial Services, LLC, which was formed to provide equipment leasing services; however, as of this date is not engaged in business.

SEC, and currently trades on the "Pink Sheets", which provides significantly less liquidity than a securities exchange or an automated quotation system.

11. On April 3, 2008, the Debtors purchased substantially all of the assets of Intelligent Digital Systems, LLC ("IDS"). IDS was the developer and manufacturer of the TechEye Digital Video ("DVR") recording technology. Since this acquisition, the focus of the Debtors' business has switched from integrating and installing surveillance videos systems, to designing and manufacturing surveillance video systems for resale by others; however, the Debtors still retained their original business line.

12. The Debtors currently employ six (6) full-time employees and three (3) part-time employees. The Debtors' principal executive offices are located at 1000 Industrial Way North, Suite C, Toms River, New Jersey 08755.

### Factors Leading up to Chapter 11 Filings

13. Since the inception of operations, the Debtors have faced the risks and difficulties of a growth company including the uncertainties of market acceptance, competition, cost increases and delays in achieving business objectives. The Debtors have experienced operating losses for the years ended December 31, 2009 and 2008. The losses were attributed, in part, to a substantial decrease in revenue due to the downturn in the larger economy, and the reduction in the Debtors' sales staff combined with an established overhead costs base which could not be reduced at the same rate that revenues declined and non-cash charges attributable to conversions of debt to equity. In addition, the Debtors have been confronted with limited liquidated resources and have been forced to combat litigation.

14. Among the litigation that has wreaked havoc upon the Debtors' operations is a law suit commenced on or about March 27, 2009 by IDS, Mr. Jay Russ, a former director of the

4

Debtors, and the Russ & Russ PC Defined Benefit Pension Plan against VMS, Inc., Jason Gonzalez and certain board members. The Russ plaintiffs assert, *inter alia*, misrepresentation, securities fraud and breach of duty by the Debtors and their current board members and also assert claims regarding non-payment of amounts allegedly due to the Russ plaintiffs pursuant to agreements entered into in connection with the asset purchase of IDS. The securities claims were dismissed; however, the Russ plaintiffs obtained a judgment against VMS, Inc. on September 30, 2010, in the aggregate amount of $2,463,856.

15. In addition to the Russ litigation, the Debtors are parties to approximately nine (9) pending law suits for claims aggregating in excess of $1,000,000. Two of the plaintiffs recently obtained judgments against the Debtors.

16. The Debtors net revenues for the year ended December 31, 2008 was $6.4MM and for the year ended December 31, 2009 was $2.6MM. The Debtors net revenues for the three months ended March 31, 2010 was $441,000.

17. The Debtors total cost of goods sold for the year ended December 31, 2008 was $3.6MM and for the year ended December 31, 2009 was $1.4MM. The Debtors total cost of goods sold for the three months ended March 31, 2010 was $216,000.

18. The Debtors operating expenses for the year ended December 31, 2008 was $9MM and for the year ended December 31, 2009 was $3.7MM. The Debtors operating expenses for the three months ended in March 31, 2010 was approximately $616,000.

19. On November 31, 2007, the Debtors entered into a securities purchase agreements with three affiliated institutional investors for the sale of original issue discount 5% senior secured convertible debentures and common stock purchase warrants. The three institutional investors are Enable Growth Partners LP, Enable Opportunity Partners LP and Pierce Diversified

Strategy Master Fund LLC, ENA (collectively "Enable"). In the transaction with Enable, the Debtors issued an aggregate of $3.75MM principal amount of the debentures at an original issue discount of 20% and warrants to purchase in aggregate of 11,250,000 shares of the Debtors' commons stock. As of the Petition Date, the total principal balance of the debentures owing to Enable aggregated $5,909,727.98. This obligation is secured by all of the assets of the Debtors. The Debtors are in default on this obligation having not made any payments to Enable since November 2008. The Debtors anticipate that Enable will cooperate during the course of the Chapter 11 cases to afford the Debtors the opportunity of proposing a plan of reorganization or some agreeable restructuring.

## Assets

20. The Debtors' assets as of the Petition Date consist of (i) cash in the amount of approximately $20,000; (ii) accounts receivable in the amount of approximately $80,000; (iii) inventory in the amount of approximately $160,000 at the lower of costs or market; (iv) property and equipment having a value of approximately $13,000; and (v) software intellectual property having a value in an undetermined amount.

## Debtors' Pre-Petition Debt

21. As stated above, Debtors owe its secured creditor Enable approximately $5,909,727.98. The Enable obligations appear to be secured by properly filed UCC statements.

22. As of the Petition Date, the Debtors have outstanding tax obligations aggregating approximately $450,000. In addition, the unsecured debt including judgments is approximately $5,850,000.

## Post-Petition Operations

23. Subsequent to the Petition Date, the Debtors anticipate continuing to design, manufacture and sell surveillance software and hardware, and to provide installation, tech support and onsite services to existing customers and new customers. Annexed hereto as Exhibit "A" is the Debtors' budget for the next month and the next three months. The Debtors' budget is conservative and does not include any revenues that may be achieved through large projects which are mature, but which have not yet yielded substantial revenues.

## Factors Important to the Success of this Chapter 11 Case

24. The Debtors do not intend to languish in Chapter 11. The Debtors are a party to Software Development and Technology License Agreement with Royal Services and Rentals, Inc. ("Royal") and an Installation and Evaluation Contract with Speedway SuperAmerica, LLC. ("SSA") These agreements represent a highly realistic potential for very substantial revenue streams upon completion of long term software development projects for those customers currently nearing finalization. In the case of Royal, the Debtor has spent a year developing technology to allow for transmission of real-time, highly compressed video over low bandwidth satellite data uplink for the oil-field services industry. In the case of SSA, the Debtor has spent almost two years developing a customized surveillance software suite for rollout to SSA's 1700+ fueling station locations. The Debtors anticipate these contracts upon product completion and acceptance to yield at least an additional $2,000,000 in annual revenue for each of the next three years, on top of their existing operations. The Debtors have also had preliminary discussions with Enable, who it anticipates will support continued operations. The Debtors will have discussions with all parties regarding the future operations and the prospects for financing.

25. The Debtors intend to quickly file a plan of reorganization that will allow for the maximizing of asset values for the benefit of all creditors.

26. The First Day Orders will enable the Debtors to stabilize and proceed accordingly.

27. Accordingly, the Debtors respectfully request that the Court enter the First Day Orders.

## Motion for Use of Cash Collateral

28. By the Debtors' Motion for the Entry of an Order Authorizing Interim and Final Use of Cash Collateral (the "Cash Collateral Motion"), the Debtors seek authority to use cash collateral pursuant to sections 105, 363(c)(2)(B) and 363(e) of the Bankruptcy Code.

29. Enable has an alleged perfected security interest in the Debtors' assets, including its cash, cash equivalents and accounts receivable (collectively, the "Cash Collateral")

30. As set forth more fully in the Cash Collateral Motion, the Debtors should be authorized to use the Cash Collateral in the ordinary course of its business and in accordance with the Budget annexed as Exhibit "A" hereto and also annexed as Exhibit "A" to the Cash Collateral Motion. Enable's security interest is not being diminished by the use of Cash Collateral. As a matter of fact, the Budget provides that the Debtors will be able to make a monthly payment to Enable, and further reflect that the Debtors will be operating cash flow positive. Accordingly, the Debtors believe that Enable is adequately protected.

31. It is in the best interests of the Debtors and their estates that the Debtors' operations continue for any cessation in business will render the assets worthless and also result in the termination of the Royal Agreement. Accordingly, the Debtors must be authorized to use the Cash Collateral.

### Motion for Joint Administration

32. By the Motion for an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (the "Motion for Joint Administration"), the Debtors are requesting entry of an Order directing that their Chapter 11 cases be jointly administered pursuant to Fed. R. Bankr. P. 1015(b). As set forth more fully in the Motion for Joint Administration, each of the Debtors is an "affiliate" within the meaning of 11 U.S.C. § 101(2)(B). Moreover, as detailed in the Motion for Joint Administration, joint administration will result in a more economical and efficient administration of these Chapter 11 cases than would be achieved if each of the Debtors' Chapter 11 proceedings were administered separately.

### Motion for Extension of Time to File Schedules and Statements

33. By the Motion For Entry Of An Order To Extend Time To File Their (i) Schedules Of Assets And Liabilities, (ii) Statements Of Financial Affairs, And (iii) Schedules Of Executory Contracts And Unexpired Leases (the "Motion to Extend Time"), the Debtors seek entry of an order, pursuant to Bankruptcy Rule 1007, extending the time within which the Debtors must file their schedules of assets and liabilities, statements of financial affairs, and schedules of executory contracts and unexpired leases (collectively, the "Schedules and Statements"), as required by § 521 of the Bankruptcy Code, through and including December 17, 2010, a date which is approximately forty (40) days after the Petition Date.

34. The Debtors' management and employees, together with their outside legal, have been working diligently to compile the information necessary for the Schedules and Statements. The magnitude of that task, when taken together with the considerable stresses of preparing for the filing of these chapter 11 cases, the anticipated burdens of preparing the Debtors' transition into chapter 11, the limited staffing that the Debtors' are currently working with, and ongoing

burdens of operating the Debtors' businesses day-to-day, supports an extension of the deadline set forth in the Bankruptcy Rules for filing the Schedules and Statements.

35.   The relief requested in the Motion to Extend Time will not prejudice or adversely affect the rights of the Debtors' creditors or other parties-in-interest. The extension requested by the Motion to Extend Time will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements, which in turn will promote efficient administration of these chapter 11 cases.

## **Wage Motion**

36.   By the Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363 And 507(a)(3) Authorizing, But Not Directing, The Debtors To Pay Pre-Petition Wages, Salaries, Taxes And Other Compensation (the "Wage Motion"), the Debtors seek authorization to pay certain pre-petition obligations to and on behalf of the current employees, including, but not limited to, the amounts owed for wages, salaries, commissions and all related taxes. In addition, the Debtors request authorization to continue to honor its paid time off policy in a fashion that would allow each employee to continue to be paid for the days in which they utilize for vacation or sick days (collectively, the pre-petition wages, etc. and the paid time off are referred to as the "Pre-Petition Employee Obligations") .

37.   With respect to Wages, the Debtors pay every other week, one week in arrears. By way of example, the November 12, 2010 payroll covers the two week period of October 22, 2010 through November 5, 2010. As a result thereof, the Debtors estimate the total amount of Pre-Petition Employee Obligations sought to be paid pursuant to this Motion is approximately $25,000.00, which includes all applicable taxes.

38. With respect to vacation days and sick days, the employees have two weeks to four weeks per annum. There is no banking of vacation or sick days nor payment upon resignation or termination.

39. Pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, claims against the Debtor for "wages, salaries, or commissions, including vacation, severance and sick leave pay," earned within one hundred eighty (180) days before the Petition Date, are afforded unsecured priority status to the extent of $10,950.00 per employee.

40. I am advised that, in the instant case, the Pre-Petition Employee Obligations constitute Priority Claims. The Debtors have discussed same with Enable, who has indicated a willingness to allow these obligations to be paid from their collateral.

41. Many of the Debtors' employees are compensated at modest levels. It would cause a great hardship to them if they were to lose (or suffer delay in receiving) their pay and/or benefits, which Enable is cognizant of this fact.

42. To avoid the hardship that the Debtors' employees may otherwise suffer and to maintain morale for the employees that have remained with the Debtors under what are and will continue to be extremely difficult working conditions, the Debtors seek authority to satisfy the Pre-Petition Employee Obligations.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: November 8, 2010

_____
Jason Gonzalez
President, Visual Management Systems, Inc.,
Visual Management Systems, LLC and
Intelligent Product Development Group, LLC

**EXHIBIT "A"**

**Visual Management Systems, Inc., Proposed Budget**

| Minimum Operating Expenses | 1 Month | 3 Month |
|---|---|---|
| Payroll - All Current Employees (less HC Digital) | $42,000.00 | $126,000.00 |
| Rent - NJ and Ohio Facilities | $4,800.00 | $14,400.00 |
| Utilities | $1,000.00 | $3,000.00 |
| Telephone & Internet | $2,000.00 | $6,000.00 |
| Corporate Insurance | $7,000.00 | $21,000.00 |
| Health Insurance | $3,000.00 | $9,000.00 |
| Auto Notes Payable | $2,000.00 | $6,000.00 |
| Office Expenses, Shipping | $6,000.00 | $18,000.00 |
| Travel & Vehicle Expenses | $2,500.00 | $7,500.00 |
| Monthly Bankruptcy Attorney Fee | $10,000.00 | $30,000.00 |
| Enable Adequate Protection Payment | $10,000.00 | $30,000.00 |
| Accounting 1099 Employee | $2,500.00 | $7,500.00 |
| Software Development 1099 Employee | $11,000.00 | $33,000.00 |
| **Total** | **$103,800.00** | **$311,400.00** |

| Revenue Projection | 1 Month | 3 Month |
|---|---|---|
| El Rancho Taco Bell Installation (per month at least 6 months of work) | $11,500.00 | $34,500.00 |
| Sarku Sales and Installation (per month, at least 6 months of work) | $15,000.00 | $45,000.00 |
| On-Site Service | $7,500.00 | $22,500.00 |
| Remote Tech Support | $2,500.00 | $7,500.00 |
| DVR Repair | $7,500.00 | $22,500.00 |
| Returning Customer Dealer Sales | $5,000.00 | $15,000.00 |
| New Dealer Sales | $27,500.00 | $82,500.00 |
| New Installation Sales | $80,000.00 | $240,000.00 |
| **Total** | **$156,500.00** | **$469,500.00** |

| | 1 Month | 3 Month |
|---|---|---|
| **Parts Cost for Stated Revenue** | $51,645.00 | $154,935.00 |
| **Free Cash** | $1,055.00 | $3,165.00 |